IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHANIE DESANTIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-292 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Stephanie DeSantis and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted to the extent she seeks remand for further consideration.

### II. BACKGROUND

#### A. Factual Background

Stephanie DeSantis was born in 1973 and began working part-time as a cashier in a fast food restaurant while she was

1

still in high school. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 5, "Tr.," at 53, 67.) Although she later earned a real estate license (Tr. 68), she never worked in that field, but continued to work intermittently as a part-time waitress.

In February 1993, Plaintiff injured her back while working at a restaurant and was off work for sometime. She later described this period as when "I lost control of my life," noting that for the next three or four months, she stayed in bed most of the time, was depressed, slept excessively, and did not eat well. (Tr. 109.) In April 1995, she reported chronic depressive symptoms to her family physician who prescribed a minimal dose of Zoloft.[1]  On October 10, 1995, she sought mental health treatment through the Emergency Services Department at the Hamot Institute for Behavioral Health ("Hamot") in Erie, Pennsylvania, and received regular counseling there for over a year. (Tr. 112.) In January 1997, after her file at Hamot was closed "due to a mix-up," Plaintiff felt "her trust was violated," and refused to return. Eventually she began cognitive behavioral therapy and medication counseling

---

[1]  Zoloft (sertraline) is used to treat depression, obsessive/ compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder. Sertraline is one of a class of antidepressants known as selective serotonin re-uptake inhibitors ("SSRIs") which work by increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance. *See* drug and supplement information at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus/druginfo (last visited September 24, 2007), "Medline Plus."

until May 30, 1997. On October 28, 1998, Hamot formally terminated treatment for Ms. DeSantis because she had stopped taking her medication, did not keep therapist appointments, and did not respond to outreach programs. (Tr. 115-116.)

During the period June 1997 through April 2004, Ms. DeSantis received no on-going mental health treatment but was seen regularly by her primary care physician and other doctors for physical problems. On April 26, 2004, Ms. DeSantis reported to Dr. Erik Esper that she was experiencing increased depression. Dr. Esper described her mood at that time as described as "weeping, upset, depressed [with an] anxiety component;" he prescribed Lexapro.[2] (Tr. 162, 262.)

Dr. Baron T. Denniston, a psychiatrist, began treating Ms. DeSantis on May 18, 2004, at Dr. Esper's suggestion. His initial diagnoses were major depressive disorder, recurrent, generalized anxiety disorder, obsessive/compulsive disorder, and attention deficit disorder. (Tr. 191.) Plaintiff consulted with Dr. Denniston regularly thereafter, usually on a bi-monthly or monthly basis, until at least December 2005.

Throughout the period 1997 to 2005, Ms. DeSantis continued to work part-time as a restaurant server, never earning more than about $4,900 a year. (Tr. 46.)

---

[2] Lexapro (escitalopram), also an SSRI, is used to treat depression and generalized anxiety disorder. See drug and supplement information at Medline Plus.

B.    Procedural Background

On May 10, 2004, Ms. DeSantis applied for disability and supplemental security income benefits.³ (Tr. 43-45 and 246-248, respectively.) Both applications were initially denied on July 20, 2004 (Tr. 28-33; 250-254), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.") (Tr. 35.)

On January 12, 2006, a hearing was held before the Honorable James J. Pileggi at which Plaintiff was represented by counsel. Judge Pileggi issued his decision on March 29, 2006, again denying DIB and SSI benefits. (Tr. 13-21.) The Social Security Appeals Council declined to review the ALJ's decision on October 12, 2006, finding no reason pursuant to its rules to do so. (Tr. 6-8.) Therefore, the March 29, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on December 13, 2006, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that

---

³ A previous application for disability insurance benefits was denied on September 16, 1996, at the reconsideration stage and Plaintiff apparently did not pursue the denial further. (Tr. 60-61.) Plaintiff does not take issue with the ALJ's decision at the hearing that he would not reconsider that denial. (Tr. 261.)

4

an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d

5

Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  LEGAL ANALYSIS

### A.  The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[4] currently existing in the national economy.[5] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i);

---

[4]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5]  The claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

6

Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  To be
granted a period of disability and receive disability insurance
benefits, a claimant must also show that she contributed to the
insurance program, is under retirement age, and became disabled
prior to the date on which she was last insured.  42 U.S.C.
§ 423(a); 20 C.F.R. § 404.131(a).  The Commissioner does not
dispute that Ms. DeSantis satisfied the first two non-medical
requirements, and there appears to be no question that Plaintiff's
date last insured has not yet occurred.[6]

    To determine a claimant's rights to either SSI or DIB,[7] the
ALJ conducts a formal five-step evaluation:

    (1)  if the claimant is working or doing substantial gainful
         activity, she cannot be considered disabled;

    (2)  if the claimant does not suffer from a severe impairment
         or combination of impairments that significantly limits
         her ability to do basic work activity, she is not
         disabled;

    (3)  if the claimant does suffer from a severe impairment
         which meets or equals criteria for an impairment listed
         in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the
         Listings") and the condition has lasted or is expected to
         last continually for at least twelve months, the claimant
         is considered disabled;

---

[6]  There is an inconsistency between the Social Security
Administration's determination that Plaintiff's date last insured will
be December 31, 2008 (Tr. 60), and the ALJ's conclusion that the
correct date will be September 30, 2009 (Tr. 18.)  The correct date is
irrelevant for purposes of analysis at this time.

[7]  The same test is used to determine disability for purposes of
receiving either type of Social Security benefits.  Burns v. Barnhart,
312 F.3d 113, 119, n.1 (3d Cir. 2002).  Therefore, courts routinely
consider case law developed under both SSI and DIB applications.

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform her past relevant work, she is not disabled; and

(5) if, taking into account her RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Pileggi first concluded that Ms. DeSantis had not engaged in substantial gainful activity "at any time relevant to [his] decision," even though she had worked part-time[9] after her amended alleged onset date of

_____

[8] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[9] Although part-time work can constitute substantial gainful employment ("SGA"), the Social Security Administration has established an upper limit for income a claimant may receive without those earnings giving rise to the conclusion that he has performed SGA. Before June 1999, this amount was $500 per month; it was increased to $700 per month as of July 1999 and has been calculated by formula since that time. The ALJ did not explicitly calculate the amounts Ms. DeSantis earned each year from 1998 through 2005, but the Court notes that her highest average for any year was $408 per month in 2005, well below the earnings level which constitutes SGA.  See 20 C.F.R. § 416.974 and SGA calculator at www.ssa.gov/OACT/COLA/SGA.html, last visited September 24, 2007.

8

October 28, 1998.[10]   (Tr. 18 and 16.)   Resolving step two in Plaintiff's favor, the ALJ found that her only severe impairment was depression characterized by poor sleep and mood swings, and she alleged no vocationally significant physical limitations.   (Tr. 18.)   At step three, the ALJ concluded that Plaintiff's depressive symptoms did not satisfy the criteria in Listing 12.04, Affective Disorders, or any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 18-19.)

At step four, the ALJ concluded that Ms. DeSantis had the residual functional capacity to perform "simple, repetitive, routine work that [did] not require teamwork [or] more than incidental interaction with the public, in a low stress environment

---

[10]   At the hearing, the ALJ and Plaintiff's attorney agreed that Plaintiff's alleged onset date of December 1, 1995, would not be valid because of the denial of her first applications for benefits on September 9, 1996.  Having agreed that any date after September 10, 1996, would be "kind of arbitrary," they decided that October 28, 1998, would be "as good as any."  (Tr. 261-263.)  There appears to be no logic behind this choice since that was simply the date on which medical staff at Hamot prepared a final closing summary of Ms. DeSantis's treatment from March through May 1997.  (Tr. 115-116.)  Other than receiving psychotropic medication from her primary care physician, there is no evidence that Plaintiff received any other mental health treatment until May 18, 2004, when she began seeing Dr. Denniston and reported that her depression had returned some four or five months previously.  (Tr. 190.)  On remand, should Plaintiff be found disabled, the ALJ should follow the procedures outlined in SSR 83-20, "Onset of Disability," which are applicable to cases in which the onset date must be inferred due to lack of direct evidence to support a specific date.  As stated therein, determining how long the condition existed at a disabling level of severity "depends on an informed judgment of the facts," which must, in turn, "have a legitimate medical basis," a factor which appears to be missing in the choice of onset date herein.  See, in general, Jakubowski v. Comm'r of Soc. Sec., No. 06-1377, 2007 U.S. App. LEXIS 484, *7-*10 (3d Cir. Jan. 10, 2007), discussing application of SSR 83-20.

9

[with] no high quotas or close attention to quality production standards." (Tr. 19.) He further concluded that due to her non-exertional limitations, she could not perform her previous work as a restaurant server, which the vocational expert ("VE") at the hearing, Joseph Kuhar, Ph.D., had described as unskilled light work. (Tr. 20; see also Tr. 289.)

In response to the ALJ's hypothetical question at the hearing, Dr. Kuhar had testified there were numerous unskilled medium-level jobs such as institutional laundry worker, retail stock person, and janitor and unskilled light-level positions such as office cleaner, dietary aide, and presser/dry cleaner which an individual of Ms. DeSantis's age, education, and non-exertional limitations could perform in the local or national economy. (Tr. 20; see also Tr. 290-291.) Based on Plaintiff's status as a younger individual[11] with at least a high school education, a history of unskilled work which did not provide transferrable skills, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. DeSantis was not disabled and, consequently, not entitled to benefits. (Tr. 20.)

### B. Plaintiff's Arguments

Plaintiff argues that the ALJ committed multiple errors

---

[11] Plaintiff was 25 years old on the amended disability onset date and 32 at the time of the hearing, making her a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

10

of law in evaluating the evidence of record.  First, the ALJ erred at step two of his analysis by finding that Ms. DeSantis's only severe impairment was depression, contrary to medical evidence showing she had been diagnosed with not only recurrent major depression but also with generalized anxiety disorder, obsessive/ compulsive disorder, and attention deficit disorder.  (Brief in Support of Plaintiff's Motion for Summary Judgment, Docket No. 8, "Plf.'s Brief," at 7.)  Second, the ALJ made a number of factual errors regarding her mental health treatment which caused him to reach an erroneous conclusion regarding the extent of her residual functional capacity.  (Id. at 8.)  Third, the ALJ erroneously established prerequisites for a finding of disability which are not required by the Commissioner, particularly with regard to her mental health treatment and her part-time work after the alleged onset date. (Plf.'s Brief at 8-10.)  Fourth, the RFC determination was without medical evidence support and, in fact, was contradicted by substantial evidence in the form of medical records from Dr. Denniston.  (Id. at 11-15.)  Finally, the ALJ's conclusion that Ms. DeSantis was not credible was neither clear nor reasonable inasmuch as it was based on a selective review of the medical evidence which - had it been considered in its entirety - would have supported Plaintiff's subjective complaints.  (Plf.'s Brief at 15-16.)

Rather than address these arguments individually, we review the entire analysis, raising several questions which we conclude

11

require reconsideration and further explication on remand.

     1.   *The ALJ's summary and analysis of the medical evidence:*  As noted above, the ALJ concluded that (1) Ms. DeSantis's only severe impairment was depression,[12] (2) the severity of her depression did not satisfy Listing 12.04, Affective Disorders, and (3) despite this condition, she retained the RFC to perform "simple, repetitive, routine work that [did] not require teamwork [or] more than incidental interaction with the public, in a low stress environment." (Tr. 18-19.) In arriving at these conclusions, the ALJ made a number of findings with regard to the medical evidence of record:

> Although [Plaintiff's] depressive symptoms satisfy the "A" criteria for listing 12.04,[13] there is no indication

---

[12]  In her application for benefits, Plaintiff stated that her ability to work was limited due to a combination of "depression, anxiety, heart problems and endometriosis." (Tr. 63.) At the hearing, however, the ALJ and counsel agreed that her disability was due to her mental impairments. (Tr. 292-293.) Plaintiff does not raise any issues concerning her physical impairments in her brief in support of the motion for summary judgment and, consequently, the Court will not consider medical records or other portions of the transcript which refer only to physical limitations.

[13]  The Social Security Administration has developed a special technique for reviewing evidence of mental disorder claims. Listing 12.04 sets out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria. To meet this Listing, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria. The A criteria require the claimant to show the medically documented persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific traits; manic syndrome with at least three of eight traits; or bipolar syndrome with both manic and depressive traits. To satisfy the B criteria, the claimant's depressive, manic, or bipolar syndrome must be of such severity that it results in at least two of the following: "marked" (i.e., more than moderate but less than extreme) restrictions in

she is markedly limited in her ability to function socially, tolerate stress, perform activities of daily living or concentrate. Therefore the listing is not met.

The record shows she has never been in in-patient treatment, there are gaps in her treatment (she explained she did not trust her doctor), she has no therapist, and she does not take medication consistently.

The record shows the claimant began treatment at the Hamot Medical Center in 1998[14] and was discharged due to non-compliance. (Exhibit 3F.) The record contains no further evidence of mental health treatment until June 2004. At that time progress notes indicate the claimant was mildly depressed, however mental status examinations were essentially unremarkable (Exhibit 12F).

In September 2004 treatment notes indicate the claimant reported racing thoughts, agitation and impulsivity, however mental status examinations remained unremarkable (Exhibit 17F.)

The claimant receives no professional mental health treatment, has never been hospitalized and experienced a six year gap in her treatment.

---

activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. To satisfy the C criteria, the claimant must present medical evidence that his affective disorder has lasted at least two years, resulting in "more than a minimal limitation of ability to do basic work activities." The symptoms or signs of the affective disorder must be currently attenuated by medication or psychosocial support. The C criteria also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

[14] This statement is incorrect since a comprehensive review of the record shows that Ms. DeSantis began treatment at Hamot in 1995 through its emergency services department. (Tr. 105.) Her treatment was interrupted in January 1997 when there was an unexplained "mix-up" in her records, but she returned for further treatment until May 1997. (Tr. 115.)

(Tr. 19.)

We are compelled to agree with Plaintiff that this summary of the medical evidence (1) omits any consideration of Plaintiff's other mental diagnoses; (2) omits several aspects of her depressive symptoms which negatively impact on her ability to perform substantial gainful activity; (3) misstates or omits critical medical evidence; and (4) appears to establish medical criteria which are not consistent with Social Security Administration ("SSA") regulations and rulings. We begin our analysis of these problems by summarizing Dr. Denniston's medical records for the period May 2004 through December 2005.

Exhibit 12F consists of Dr. Denniston's records from three appointments beginning on May 18, 2004. At the initial interview, Dr. Denniston noted Ms. DeSantis had been referred to him by Glenn Bailey[15] with diagnoses of "depression (severe, agitated)" and generalized anxiety disorder. According to her history, Ms. DeSantis had been depressed and anxious since childhood, with recurrent episodes increasing when she was 23 years old and the most recent bout some four or five months previous. Her symptoms included dysphoria, sleep fluctuations, decreased energy, persistent fatigue, decreased concentration, withdrawal, and probable self-reproach. In connection with her generalized anxiety

---

[15]   It is unclear from the record whether Dr. Bailey was a psychologist, psychiatrist, or therapist. Dr. Bailey's records were requested by the SSA, but he responded that he was unable to find her file. (Tr. 217.)

disorder, she worried "about everything," was overwhelmed easily, on edge, jumpy, had sweaty palms, shortness of breath, palpitations, increased pulse, generalized fatigue, and racing thoughts. She reported that her mind wandered, she daydreamed, and was distractable. Obsessive/compulsive traits included repeated checking to be sure her curling iron was off and excessive hand washing. Prior medication trials included Prozac, Paxil and Zoloft with no positive results and Klonopin[16] which had been beneficial. (Tr. 190.) Dr. Denniston described Ms. DeSantis as neatly groomed with good eye contact and the ability to relate well. Her mood was depressed and affect dysphoric; although her speech was fluent and coherent, it was also low in volume and rate. He estimated that her Global Assessment of Functioning ("GAF") score[17] at the time was

---

[16] Prozac (fluoxetine) and Paxil (paroxetine) are used to treat depression, obsessive/compulsive disorder, some eating disorders, panic attacks, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. Like Zoloft, Prozac and Paxil are SSRIs. Klonopin (clonazepam) is used to treat anxiety disorders. *See* drug and supplement information at Medline Plus.

[17] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF rating between 41 and 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* the on-line version of *Diagnostic and Statistical Manual of Mental Disorders*, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited September 24, 2007. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

15

43.  (Tr. 191.)  He changed her medication from Buspar (which was not working) to Lexapro and Concerta[18] and recommended continued therapy and a return visit in two weeks.  (Tr. 192.)

Ms. DeSantis returned on May 25, 2004.  Although she appeared tired, her appearance was appropriate and well-groomed, her speech, eye contact, activity, judgment, and cooperation were all positive, and her affect appropriate to speech content.  She reported her mood was "generally better."  She continued to feel "down," with dysphoria, lack of motivation, and anxiety.  Concerta had been helpful, especially during the day, but had kept her awake for 21 hours.  Her insurance company would not pay for Lexapro and so Klonopin was substituted and the Concerta was replaced by Effexor-XR, another SSRI.  (Tr. 189.)

On June 11, 2004, Ms. DeSantis returned as directed by Dr. Denniston.  Her mood was "about the same."  She reported she was obsessive about cleaning, especially when "company is expected," and that she remained depressed with continued poor focus.  Again, her drugs were changed to include Adderall[19] with, it seems, a decrease in Klonopin and Effexor-XR dosages.  (Tr. 189.)

---

[18]  Buspar (buspirone) is used to treat anxiety disorders. Concerta (methylphenidate) is used as part of a treatment program for attention deficit hyperactivity disorder; it is in a class of medications called central nervous system ("CNS") stimulants. *See* drug and supplement information at Medline Plus.

[19]  Adderall (dextroamphetamine and amphetamine) is another CNS stimulant used as part of a treatment program for attention deficit hyperactivity disorder. *See* drug and supplement information at Medline Plus.

16

As noted above, the ALJ referred to Exhibit 12F, finding that during May and June 2004, Ms. DeSantis's mental status examinations were "essentially unremarkable" and that she was no more than "mildly depressed." That is, the ALJ failed to acknowledge Dr. Denniston's other diagnoses of generalized anxiety disorder, obsessive/compulsive disorder and attention deficit disorder, a GAF score which reflects "serious" symptoms or impairments in a range of psychological, social, and/or occupational activities, and the side-effects of medications. There is no other medical evidence in the record for May through June 2004 which contradicts Dr. Denniston's notes, and the Court finds that the ALJ's descriptions of her condition as "mildly" depressed and her mental health examinations as "essentially unremarkable" are inconsistent with the record, that is, not supported by substantial evidence.

The ALJ also referred to Exhibit 17F, Dr. Denniston's notes for the period July 12, 2004, through December 12, 2005, during which time Ms. DeSantis consulted with him on 18 occasions. (Tr. 225-244.) From that 18-month period, the ALJ refers only to the notes of September 7, 2004, commenting that Plaintiff had reported "racing thoughts, agitation and impulsivity." While this is an accurate quotation from the record, he fails to note that the increased racing thoughts were a side effect of one of her medications. Her affect was described as constricted and restricted and in addition to impulsivity, she reported "hypomanic

17

episodes," e.g., agitation, shopping sprees, increased amount and rate of speech, and increased anger. (Tr. 241.)

Ms. DeSantis continued to see Dr. Denniston on a bi-weekly or monthly basis from September 20, 2004, through December 12, 2005, except during a three-month period in 2005 following a report of feeling well and when her medicines seemed to be balanced.   (Tr. 232-233.)   Her mood continued to fluctuate "up and down like a yo-yo," as did her obsessive/compulsive behaviors.   Dr. Denniston continued to try to adjust her medication so she was neither fatigued and sleepy or, conversely, hyperactive, irritable, "queasy," and dizzy. On October 17, 2005, Dr. Denniston noted he had spoken with her "about risks of [increased] severe illness in the future if her moods are not stabilized now."   (Tr. 228.)   At the final session prior to the hearing before the ALJ, Ms. DeSantis reported that she was feeling "not too well," with increased anxiety and depression but decreased sleep.   (Tr. 226.)

The Court recognizes that an ALJ is not required to refer to or analyze every item of medical evidence in the record. Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001) (although the ALJ need not make reference to every relevant piece of information in the record, he must "consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law"); Phillips v. Barnhart, No. 03-2236, 2004 U.S. App. LEXIS 4630, *14 n.7 (3d Cir. Mar. 10, 2004) (the failure of the ALJ

to cite specific evidence does not necessarily establish that the such evidence was not considered.) We also recognize that the ALJ may reject certain medical evidence or give greater weight to some medical opinions than to others. See Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (the ALJ "may properly accept some parts of the medical evidence and reject other parts [but] must consider all the evidence and *give some reason* for discounting the evidence he rejects.") (Emphasis added.) In this case, however, there is no medical evidence which contradicts Dr. Denniston's multiple diagnoses or the reports of severe side-effects, neither of which is acknowledged by the ALJ.

In support of the ALJ's conclusion that Ms. DeSantis's mental status examinations were "unremarkable," Defendant cites four points in the record where her psychological state was described as "normal." (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 10, "Def.'s Brief," at 12, citing Tr. 164, 170, and 223-224.) Defendant's argument is not persuasive for multiple reasons. First, two of these reports date from before May 2004 when Plaintiff resumed treatment for her psychiatric problems, i.e., Tr. 170 dates from October 5, 1999, and Tr. 164 from August 4, 2003. Thus, a finding of "normal" at those times is not necessarily inconsistent with her report to Dr. Denniston that her most recent episode of depression had begun four or five months before she first consulted him in May 2004. Second, the records

19

are included among those of Dr. Erik Esper, but there is no indication in three out of the four instances as to who created the notes. The notes from November 15, 2004, were made by "C. Griffith" who is not further identified. Third, even if Dr. Esper were ultimately responsible for the content of these four notes, there is no evidence that he is a specialist in psychiatry as is Dr. Denniston. Therefore, had the ALJ weighed the opinions in Dr. Esper's notes against those of Dr. Denniston (which he did not explicitly do), it is well-established that greater weight should have been given to the specialist's opinions than those of a generalist. See 20 C.F.R. § 404.1527(d) setting out the criteria for weighing the opinions of various types of acceptable medical sources; see also Fargnoli, 247 F.3d at 43 and Sykes, 228 F.3d at 266, n.7. Fourth, in each instance, the indication that Ms. DeSantis's psychiatric condition was normal is simply a check mark on a form. The United States Court of Appeals for the Third Circuit has noted that in such "check-the-box" circumstances, little or no weight is to be given to such evaluations. Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)(a report which requires the physician "only to check boxes and briefly fill in blanks" is "weak evidence at best," and where "these so-called reports are unaccompanied by thorough written reports, their reliability is suspect.") Finally, the ALJ does not refer at any point in his decision to the Exhibits from which Defendant's citations are drawn

20

(Exhibits 11F and 16F.) By relying on this evidence, Defendant has contradicted a cardinal principle of administrative law, that is, "the grounds upon which an administrative order must be judged are those upon which the record disclosed that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87 (1943); *see also* Fargnoli, 247 F.3d at 43-44 and n.7., and Cefalu v. Barnhart, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005) ("the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ.")

The Court also finds disturbing the ALJ's statements that Ms. DeSantis "receives no professional mental health treatment," "has no therapist," and "does not take medication consistently." Although not a psychologist or therapist *per se*, Dr. Denniston's notes certainly reflect that he discussed Ms. DeSantis's condition and symptoms with her during every appointment in addition to providing medication checks, treatment which rationally must be considered "professional mental health treatment." As Plaintiff points out (Plf.'s Brief at 9), there appears to be no SSA regulation which requires claimants with mental impairments to show that they are undergoing therapy before they can be considered disabled. *See* 20 C.F.R. § 12.00.B, noting that psychological abnormalities must be "described by an appropriate medical source."

Evidence of a medically determinable mental impairment must come from "an acceptable medical source" (20 C.F.R. § 12.00D), which includes, e.g., licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). As a psychiatrist, Dr. Denniston certainly would be considered an acceptable and appropriate medical source to opine about mental impairments.

Moreover, the evidence shows that although Dr. Esper recommended in May 2004 that Ms. DeSantis consult with Dr. Bailey, she later explained to Dr. Denniston that she had stopped seeing him because she "did not feel it helped." (Tr. 188.) While Dr. Denniston's notes indicate that the subject of therapy was discussed on September 20, October 4, and December 6, 2004, he appeared to accept Ms. DeSantis's resistence to Dr. Bailey and indicated that he would recommend therapy with "Solutions" or "Bobbe [sic] Cullers" (Tr. 236, 238, 240.) As the Social Security Administration has directed, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Kinney v. Comm'r of Soc. Sec., No. 06-2738, 2007 U.S. App. LEXIS 16211, *6-*7 (3d Cir. July 6, 2007), *quoting* Social

Security Ruling[20] ("SSR") 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." The Court has been unable to pinpoint any evidence in Dr. Denniston's notes which would indicate that after December 2004, he continued to encourage her to see a therapist or that she agreed to do so but failed to comply.[21]

Regarding the ALJ's comment that Ms. DeSantis "does not take medication consistently," we first note that Dr. Denniston's records are replete with references to side effects from medication such as headaches, dizziness, nausea, irritability, weight loss, insomnia or, conversely, excessive sleeping. As Plaintiff summarizes in her brief, over the 22-month period in which he was treating her, Dr. Denniston prescribed some 12 types of medication for her four mental impairments. (Plf.'s Brief at 3-6.) Thus, it cannot be said that she did not take medication for her impairments

[20] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

[21] Defendant cites Tr. 238 and 240 as evidence that Ms. DeSantis "declined to pursue outpatient therapy." (Def.'s Brief at 7.) However, a closer reading of both these notes shows that Plaintiff refused to pursue therapy specifically with Dr. Bailey, not therapy in general. Plaintiff testified that she would see a therapist if Dr. Denniston said she needed one. (Tr. 274.) There is also a note from December 6, 2004, that Ms. DeSantis "wants to change Tx-ists," [therapists?] (Tr. 236), further, albeit tenuous, evidence that she at least attempted therapy at that time.

23

"consistently" during the period May 2004 through January 2006.

If, however, the ALJ meant to imply that Plaintiff had failed to consistently follow prescribed treatment, his analysis is deficient in that it does not consider whether there were good reasons for doing so. If a claimant for disability benefits fails to follow a treatment prescribed by her physician (assuming such treatment could restore her ability to work) "without good reason," she will be found not disabled. 20 C.F.R. § 404.1530. In those cases, however,

> appropriate development must be made to resolve whether the claimant . . . is justifiably failing to undergo the treatment prescribed. . . . The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.

SSR 82-59, "Failure to Follow Prescribed Treatment."

The medical records show that Ms. DeSantis stopped taking some medications because of the cost or because her insurance plan would not pay for them. (Tr. 189, 229, 243.) She also stopped taking medication, at least temporarily, due to other medical situations, e.g., surgery or concerns about the effect of the medication if she were to become pregnant. (Tr. 234-236.) Third, she stopped taking medication because of the numerous side effects listed above. (Tr. 228, 237.) Contrary to SSA policy, the ALJ gave Ms. DeSantis no opportunity at the hearing to explain why she had failed to follow prescribed treatment, nor was there any "appropriate development"

24

in the ALJ's opinion of his reasoning with regard to the evidence on this subject in the medical record.

The omission of any discussion of the side-effects of the various medications is of particular concern in the ALJ's analysis of Ms. DeSantis's residual functional capacity. *See* Burns v. Barnhart, 312 F.3d 113, 130 (3d Cir. 2002), *citing* Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287, 290 (3d Cir. 1983) (the "implicit rejection" of the claimant's side effects required remand where the ALJ's opinion gave no indication that the issue was considered). Although Judge Pileggi acknowledged that at step four, he was required to take into account "all symptoms in accordance with the requirements of 20 C.F.R. 404.1529 and 416.929" (Tr. 19), both of those regulations clearly state that where symptoms "suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must consider other information. Among the seven factors[22] relevant to this consideration is "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv). As noted above, Dr. Denniston referred on

---

[22] The other factors are (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other subjective symptoms; (3) precipitating and aggravating factors; (4) treatment other than medication for relief of pain or other symptoms; (5) other measures used to relieve subjective symptoms; and (6) other factors concerning the claimant's functional limitations and restrictions. 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

numerous occasions to the side effects of the various drugs and to his attempts to manage her medications so that they would be effective but produce minimal side effects. Fatigue, drowsiness, and the inability to concentrate would all reasonably be expected to negatively impact Plaintiff's ability to perform substantial gainful activity on a regular and continuing basis. But in the absence of any discussion by the ALJ of these serious side effects (which are not contradicted by other medical evidence of record), this Court "cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.3d 705, 707 (3d Cir. 1981).

     2.   *The ALJ's failure to consider Plaintiff's other mental impairments:*  As noted above, the only mental impairment discussed by the ALJ was Plaintiff's depression, despite uncontradicted medical evidence that she was also diagnosed with attention deficit disorder, obsessive/compulsive disorder, and generalized anxiety disorder. Defendant argues that there is no merit to Plaintiff's contention that this constitutes an error on the part of the ALJ because (1) he found that she did have one severe mental impairment and (2) he "never explicitly found that [the other] impairments were non-severe." Moreover, according to Defendant,

> substantial evidence of record, which includes Plaintiff's normal psychiatric examinations, the nature and extent of her mental health treatment, her daily activities, and Dr. Tarter's expert opinion, shows that

26

the mental limitations associated with these impairments
were not disabling.

(Def.'s Brief at 15-16.)[23]

Once again, Defendant's argument is not persuasive and not
based in the law.

Dr. Sharon Becker Tarter, the state agency psychologist who
performed a file review as of July 9, 2004, did not dispute Dr.
Denniston's diagnoses in addition to major depression.   (Exhibit
13F, Tr. 193-208.)  "State agency physicians and psychologists are
considered to be 'highly qualified physicians and psychologists who
are also experts in Social Security disability evaluation,' and the
ALJ *must* consider their findings as opinion evidence. Poulos v.
Comm'r of Soc. Sec., 474 F.3d 88, 93, n.2 (3d Cir. 2007), *quoting*
20 C.F.R. §§ 404.1527(f) and 416.927(f) (emphasis added.)  However,
here the ALJ did not refer to Dr. Tarter's opinions, therefore, the
Court is unable to determine whether he considered them or not.[24]

_____

[23]   The first two points in this argument have already been
discussed and will not be revisited here.

[24]   The Court recognizes that when discussing certain criteria of
Listing 12.04, i.e., activities of daily living, social functioning,
concentration, persistence or pace, the ALJ apparently (but not
explicitly) relied on Dr. Tarter's evaluations to support his
conclusion that Plaintiff was not "markedly limited in her ability to
function socially, tolerate stress, perform activities of daily living
or concentrate." (Tr. 19) Otherwise, the ALJ makes no independent
analysis of this issue and does not explain the evidence on which this
conclusion is based.  We find the ALJ's discussion of Listing 12.04
somewhat cursory and incomplete (e.g., there is no recognition of the
"C criteria"), however, Plaintiff does not object to his analysis,
apparently agreeing that she did not satisfy Listing 12.04.
Consequently, the Court will not address this point.

27

Nor is there any other medical evidence to refute Dr. Denniston's diagnoses of these impairments and Dr. Tarter's concurrence that they existed. As the Third Circuit Court of Appeals has held, an impairment, once established, must be considered "severe" unless the evidence demonstrates that it is merely a "slight abnormality," having "no more than a minimal effect on an individual's ability to work." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546-547 (3d Cir. 2003), quoting SSR 85-28, "Medical Impairments That are Not Severe." "Reasonable doubts on severity are to be resolved in favor of the claimant." Newell, id.

Defendant's argument that the ALJ's analysis is sufficient because he "never explicitly found that [the other] impairments were non-severe" also misses the mark. The ALJ did not discuss the other impairments at all. Once these impairments were established, the ALJ was required to ascertain if each of them was severe or not severe. If severe, the impairment should have been considered vis-a-vis the relevant Listing, 12.02 in the case of attention deficit disorder and 12.06 in the case of generalized anxiety disorder and obsessive/compulsive disorder.[25] The ALJ did not do this. Nor did he consider if these impairments, taken in combination, met or satisfied one of the listings. See Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000), remanding in part because the ALJ

---

[25] Listings 12.02 and 12.06 employ a three-part analysis similar, but not identical, to that of Listing 12.04 discussed in note 13 above.

28

failed to consider all pertinent evidence in considering the combined effects of the claimant's impairments.

On the other hand, even if the attention deficit disorder, generalized anxiety disorder and obsessive/compulsive disorder were considered non-severe, they should have been included in the ALJ's analysis of Plaintiff's RFC. The ALJ acknowledged that he "must consider all of the claimant's impairments, including impairments that are not severe." (Tr. 18, *citing* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e) and 416.945, and SSR 96-8p, "Assessing Residual Functional Capacity in Initial Claims.") However, when applying this rule, the only impairment discussed in his opinion was "a history of depression characterized by poor sleep and mood swings." (Tr. 18.) While it is entirely within the ALJ's purview to reject medical evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See* Burnett, id. at 121, *quoting* Cotter, supra.

The omission of these three impairments may also have caused the hypothetical question to the vocational expert to be inadequate. It has long been the rule in this Circuit that the answer to such a question may be considered substantial evidence only if the question incorporates "all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

The hypothetical question posed to the VE stated that

29

Plaintiff

> . . . would be limited to simple repetitive type work, routine work processes and settings and she would not be able to engage in high stress work which I'll define as high quotas or close attention to quality production standards.   . . . She should not engage in work that would be more than incidental interaction with the public if she were to work a full-time job. And she should not work in jobs requiring teamwork where people work together in concert to accomplish a task.

(Tr. 290).

The Court finds it impossible to determine if the ALJ intended this question to take into account the characteristics of her other impairments which could affect her ability to perform substantial gainful activity, for example, the hyperactivity, impulsivity and/or inattention associated with attention deficit disorder. (See description of this mental impairment at Medline Plus.)   The omission of any discussion of Plaintiff's attention deficit disorder, generalized anxiety disorder and obsessive/compulsive disorder at steps two and three raises questions about the accuracy of the ALJ's analysis at steps four and five.   The Court is thus compelled to remand this matter for further consideration of these impairments and their effects.

   3.   *The ALJ's credibility determination:*   In his opinion, the ALJ wrote:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

(Tr. 19, emphasis in original.)

Plaintiff argues that in arriving at this conclusion, the ALJ "simply ignores pertinent medical evidence and he also utilizes incorrect disability criteria." In particular, the ALJ did not adequately consider the entire body of medical evidence, did not consider her subjective complaints, did not state the facts upon which he based his conclusion, and did not consider her ability "to meet the mental demands of competitive employment on a regular, continuing and sustained basis for 8 hours a day and for 5 days per week." (Plf.'s Brief at 15-16.)

When a claimant for disability benefits challenges an ALJ's credibility determination, a reviewing Court will generally defer to his decision because the ALJ is present at the hearing and can assess a claimant's demeanor. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). Moreover, where "the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to great deference." Horodenski v. Comm'r of Soc. Sec., No. 06-1813, 2007 U.S. App. LEXIS 2874, *15 (3d Cir. Feb. 7, 2007) (internal quotation omitted.) One of the widely accepted reasons for an ALJ to find subjective complaints less than fully credible is inconsistency between the claimant's testimony and the medical evidence. Burns, 312 F.3d at 130-131.

Ms. DeSantis's statements to which the ALJ cites in this portion of his opinion include the following:

31

she "testified that she is unable to work due to depression characterized by anxiety, poor sleep and appetite, lack of trust and conflict with others;"

referring to her part-time work as a restaurant server, "she stated she frequently 'loses it' on customers and is so fatigued after work she needs to lie down and watch television;" and

"on a bad day she does not get out of bed."

(Tr. 19.)

In addition to his findings that Ms. DeSantis "has no therapist," "receives no professional mental health treatment," and "does not take medication consistently," all of which have been discussed above and found inconsistent with the medical evidence (or at a minimum, insufficiently explained), the ALJ apparently weighed the statements above against his conclusions that

she has never received inpatient treatment or hospitalization;

there is a six-year gap in her treatment (she explained she did not trust her doctor); and

she is able to work on a part-time basis.

(Tr. 19.)

Ms. DeSantis testified that after work, she is so "mentally and physically exhausted," she "sits on the couch and watches TV," and cannot accomplish normal household chores.  (Tr. 278.)  The ALJ has slightly misconstrued her testimony regarding interactions with customers and co-workers, that is, she testified that she "loses it" with co-workers about once a month but has never had such altercations with customers, with whom she gets along, "for

32

the most part, okay." Instead, she deals with such problems by telling the manager she can "no longer attend to this table." (Tr. 277.)

There is nothing in the medical evidence which is inconsistent with this testimony. To the contrary, Dr. Denniston noted on September 27, 2004, "She has to return to work (9/28) which she dreads. She has also not slept well and is exhausted, has lost 18 [pounds] since 6/04." (Tr. 239.) At the next appointment on October 4, 2004, he noted that she "tried returning to work one day but could not [function] well (dropped a stack of dessert dishes, could not concentrate well.)" (Tr. 238.)

The ALJ's reference to the fact that she has never been hospitalized for her mental impairments is relevant to his analysis of Listing 12.04 since hospitalization is one of the indicia of "episodes of decompensation," i.e., an exacerbation in symptoms or signs requiring increased treatment, a less stressful situation, or a combination thereof. Such episodes may be inferred from medical records showing "significant alterations in medication" or the need for "a more structured psychological support system," e.g., hospitalization. Listing 12.04C.4. However, such evidence is only one part of the analysis and the lack of hospitalization is not definitive proof that an impairment is not disabling. *See* Worzalla v. Barnhart, 311 F. Supp.2d 782, 796 (D. Wis. 2004); Wallace v. Barnhart, 256 F. Supp.2d 1360, 1372 (D. Fla. 2003) (hospitalization

may add to the strength of a disability claim, but is not an essential element in establishing a severe impairment.)

Plaintiff's ability to work 12 hours per week is also an element to be considered but does not prove she is not disabled. In ascertaining residual functional capacity, the ALJ is to determine the claimant's ability to work "on a regular and continuing basis."   20 C.F.R. § 404.1545(c).   Social Security Ruling 96-8p explains that this means the claimant's maximum ability to engage in work for 8 hours a day and 5 days a week or an equivalent schedule.   The ALJ's analysis should include an explanation of "how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."   Id.

Plaintiff testified she was unable to work even 16 hours a week because when she had tried to do so for a trial period, she was repeatedly getting replacements, calling off, or "I'd be so depressed that I could not even function." (Tr. 269.) She further testified that although she was assigned to work no more than approximately 13 days a month, she gets a co-worker to cover for her or simply calls off at least once a month when she is unable to work due to her mental health problems. (Tr. 279, 283.) She also stated she takes herself off the schedule (as permitted by her employer) once a month, and does not work for a full week "every

34

couple of months." (Tr. 283-285.)[26] In response to a question from Plaintiff's attorney, the VE testified that in his experience, employers would tolerate a full-time employee taking, at most, "three to four absences a month for a short duration." (Tr. 292.)

In determining that Plaintiff could perform a number of light or medium unskilled jobs,[27] the ALJ did not state his conclusions regarding her ability to do such work on a "regular and continuing basis." Nor did he resolve the inconsistencies between that requirement and her testimony that she had difficulty working more than 12 hours a week or between her testimony regarding her absences every month and the VE's testimony on that subject. See Wallace v. Apfel, No. 97-6912, 1998 U.S. Dist. LEXIS 18922, *11 (E.D. Pa. Nov. 13, 1998) (SSR 96-8p requires the ALJ to discuss the

---

[26] This testimony is also consistent with her reported activities of daily living. (See Tr. 93-92.) The ALJ does not appear to have relied on that questionnaire because there are no references to its content in his opinion.

[27] The Court notes in passing that although the vocational expert testified the jobs he identified were consistent with their descriptions in the Dictionary of Occupational Titles ("DOT") that statement appears to be not entirely correct. (See Tr. 21 and 293.) The ALJ had asked for unskilled jobs. According to the SSA, unskilled jobs can be learned from a short demonstration or in less than one month, and are described as having a "specific vocational preparation ("SVP") rating of 1 or 2. See SSR 00-4p, "Use of Vocational Expert and Vocational Specialist Evidence and Other Reliable Occupational Information in Disability Decisions." According to the DOT, the job of stock clerk (retail) requires an SVP of 4 and the job of presser/drycleaner an SVP of 3. See job descriptions at Dictionary of Occupational Titles, revised 4th edition, provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited September 20, 2007.) SVP ratings of 3 and 4 are associated with semi-skilled, not unskilled, jobs. See Boone v. Barnhart, 353 F.3d 203, 207 (3d Cir. 2003).

claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each such activity the claimant can perform based on the evidence of record.)   Moreover, in a case involving mental impairments, the ALJ should discuss the work-related mental activities generally required by "competitive, remunerative work," i.e., the abilities to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p.  No such analysis appears anywhere in the ALJ's opinion and, with the exception of the questions regarding interactions with co-workers and customers, the ALJ did not elicit information from Ms. DeSantis on these issues at the hearing.

The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), *quoting* SSR 96-7p.  Because we have previously concluded that much of the ALJ's reasoning was based on an incomplete and/or selective review of the medical record, and because his credibility determination does not satisfy numerous requirements of the Social

36

Security Administration's regulations, we further conclude there
are sufficient doubts about the accuracy of that determination --
notwithstanding the deference to which it is generally entitled -
so as to require remand for further consideration.

## V.   **FURTHER PROCEEDINGS**

Under 42 U.S.C. § 405(g), a district court may, at its
discretion, affirm, modify or reverse the Secretary's final
decision with or without remand for additional hearings.  However,
the reviewing court may award benefits "only when the
administrative record of the case has been fully developed and when
substantial evidence on the record as a whole indicates that the
plaintiff is disabled and entitled to benefits."   Krizon v.
Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting
Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, the Court is confronted with a situation in which the
ALJ's analysis fails to take into consideration the entire medical
record while at the same time focusing on extraneous matters that
should have been given little or no consideration.  We also find
numerous conclusory statements which are beyond meaningful review.
See Burnett, 220 F.3d 121 (evidence is not substantial if the ALJ
failed to consider all relevant evidence or explain the resolution
of conflicting evidence); Jones v. Barnhart, 364 F.3d 501, 505 (3d
Cir. 2004) (while the ALJ is not required to use particular
language or adhere to a particular format in his analysis, there

must be "sufficient development of the record and explanation of findings to permit meaningful review.")  Yet, at the same time, Plaintiff's credibility - a determination for the ALJ, not this Court - is a crucial element in determining the severity of her impairments.  The Court concludes remand is the most appropriate resolution so that the ALJ may expand and clarify his analysis in keeping with the opinions expressed herein.

An appropriate order follows.

September ___25___, 2007

William L. Standish
United States District Judge

cc:  Counsel of Record